**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DAWN M. SPAULDING | ) | |
| Plaintiff, | ) | 16-cv-6298 |
| | ) | |
| v. | ) | |
| | ) | Judge Michael T. Mason |
| NANCY A BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Dawn M. Spaulding ("Spaulding" or "Claimant") brings this motion for summary judgment seeking judicial review of the final decision of the Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied Spaulding's claim for disability insurance benefits under Sections 216(i) and 223(d) of the Social Security Act (the "Act"). The Commissioner filed a cross-motion for summary judgment, requesting that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted.

## I. BACKGROUND

### A. Procedural History

Claimant filed an application for a period of disability and disability insurance benefits on August 29, 2012. (R. 19.) Claimant alleges that she has been disabled since June 30, 2011 due to Lyme Disease, with meningitis and encephalitis, recurrent

arrhythmias, asthma/allergies, peripheral neuropathy to include bilateral foot pain, neck and shoulder pain, depression, anxiety, and a cognitive disorder.  (R. 152, 71-72, 465.)  Her application was initially denied on November 2, 2012, and again on May 16, 2013, after a timely request for reconsideration.  (R. 71-72.)  On June 11, 2013, Claimant requested a hearing regarding her disability application.  (R. 95.)  On August 21, 2014, she testified before ALJ Cynthia M. Bretthauer.  (R. 35.)  On October 7, 2014, the ALJ issued a decision denying Claimant's disability claim.  (R. 19-30.)  On August 20, 2015, Claimant requested review by the Appeals Council.  (R. 4.)  On April 15, 2016, the Appeals Council denied Claimant's request for review, at which time the ALJ's decision became the final decision of the Commissioner.  (R. 1-3.); *Zurawski v. Halter*, 245 F.3d. 881, 883 (7th Cir. 2001); 20 C.F.R. § 404.955, 404.981.  Claimant subsequently filed this action in the District Court.

### B. Medical Evidence

 Sometime between June 11-12, 2011, a tick bit Claimant in Wisconsin.  (R. 454.)  Over the next several days, while visiting Mexico, Claimant began experiencing fevers, headaches, bilateral leg pain, generalized fatigue, and she noted a rash on her anterior thigh.  (*Id.*)  She sought medical attention, but had a negative reaction to the prescribed medication.  (*Id.*)  Subsequently, she returned to the United States where her symptoms worsened.  (*Id.*)  She experienced sudden right side facial paralysis.  (R. 247.)  Claimant sought treatment from her primary care physician, Dr. Ann Garcelon.  (*Id.*)  Dr. Garcelon administered a lumbar puncture and thereafter admitted Claimant to Mercy Medical Center in Chicago on July 13, 2011.  (R. 246.)

Once admitted, Mercy Medical Center diagnosed Claimant with Bell's Palsy and Lyme Disease Meningitis.  (*Id.*)  The center prescribed Claimant with intravenous

antibiotics and discharged her on July 15, 2011.  (R. 285-287.)  After completion of the antibiotics, Claimant's symptoms of fatigue, cognitive problems, and foot pain continued.  (R. 320.)

### 1.  Dr.  Jeffrey Kramer, Neurological Specialist

As a result of persistent symptoms, Claimant began regular medical visits with neurologist Dr. Jeffrey Kramer.  (R. 355-60.)  These visits occurred from October 2011 through June 2012.  (*Id.*)  While some of Dr. Kramer's records are illegible, he clearly recommended that Claimant undergo a Magnetic Resonance Imaging test ("MRI") of her head and an Electroencephalogram test ("EEG") of her brain as well as treatment at the Rehabilitation Institute of Chicago ("RIC").  (R. 355.)

Based on Dr. Kramer's recommendation, on October 18, 2011, Claimant underwent an MRI and an EEG.  (R. 320.)  These test results were evaluated by Dr. Kramer and specialists at the Columbia University Medical Center, Lyme and Tick-Borne Diseases Evaluation Service.  (*Id.*)

### 2.  Columbia University Medical Center, Lyme and Tick-Borne Diseases

On November 30, 2011, Claimant saw Dr. David Hardesty of the Columbia University Medical Center, Lyme and Tick-Borne Diseases Evaluation Service.  (*Id.*)  During this appointment, Dr. Hardesty reviewed Claimant's MRI results and EEG results.  (R. 320-54.)  He then performed a series of neurological tests and he took Claimant's blood for evaluation.  (R. 320.)  First, Dr. Hardesty informed Claimant that her MRI results showed "multiple subcentimeter ectatic perivascular spaces randomly distributed about both BG/thalami and brainstem.  Strabismus noted."  (*Id.*)  Next, Dr. Hardesty told Claimant her EEG results were "mildly abnormal, with 4-5 Hz low voltage

underlying normal background 9-10 Hz, read to occasionally be more isolated to left temporal region." (*Id.*)

Dr. Hardesty then conducted neurological testing on Claimant. (R. 321.) The results of Claimant's neurological testing are captured in Dr. Hardesty's report, dated February 14, 2012. (R. 330.) The report characterized Claimant's intellectual capacity as at least high average. (*Id.*) The report detailed Claimant's gross motor speed and fine motor control as intact, but noted Claimant's reaction times were relatively slowed. (*Id.*) Dr. Hardesty's report further identified Claimant's greatest difficulties as her inattention and slowed response times. (R. 330-31.) In the report, Dr. Hardesty stated, "though [Claimant] is able to compensate for some of this slowing, performance varied across tasks as she struggled to maintain focus." (R. 331.)

On February 6, 2012, Dr. Hardesty followed up with Claimant to report that all of her blood test results were essentially normal. (R. 324.) Based on Claimant's test results, Dr. Hardesty concluded that Claimant's Lyme Disease could be the cause of her persistent fatigue and cognitive difficulties, but it was unlikely. (R. 321, 324.) Instead, Dr. Hardesty suggested that Claimant's cognitive difficulties likely stemmed from fatigue and depression. (R. 324.) Dr. Hardesty recommended Claimant seek therapy and psychiatric evaluation as needed, begin taking low dose Ritalin with cessation of caffeine, participate in cognitive training/rehabilitation, as well as fatigue management through diet, exercise, and elimination of other possible medical causes. (R. 325.)

### 3. Rehabilitation Institute of Chicago

In late 2012, Claimant began treatment at the RIC. (R. 410.) On August 29, 2012, Dr. David Ripley, Director of the Brain Trauma Unit at the RIC, assessed

Claimant.  (R. 420, 465.)  After this evaluation, Dr. Ripley referred Claimant to the physical therapy, speech therapy and vocational rehabilitation programs within the RIC.  (R. 420.)  Dr. Ripley also provided Claimant with a prescription for Ritalin to help with fatigue, attention, and memory.  (*Id.*)

On September 10, 2012, RIC staff evaluated Claimant's speech language pathology.  (R. 413.)  Claimant's chief complaint was her difficulty with language formation, attention/concentration, organization and planning, and cognitive fatigue.  (R. 414.)  During the examination, Claimant stated that her primary goal was returning to work.  (R. 413.)  Claimant also stated her current responsibilities included household financial management, home management of her three properties, planning social events, and taking Spanish classes online.  (R. 447.)  The RIC approved Claimant to participate in the outpatient speech language pathology therapy program.  (R. 416.)

On September 18, 2012, the RIC assessed Claimant for outpatient vocational rehabilitation therapy (often referred to as occupational therapy in the record) to assist Claimant with returning to work.  (R. 417.)  The RIC accepted Claimant into this program.  (R. 443.)

On October 10, 2012, Claimant saw Dr. Ripley for a follow up appointment.  (R. 423.)  During this appointment, Claimant stated that the Ritalin had been somewhat effective, but had not completely alleviated her symptoms.  (*Id.*)  Dr. Ripley prescribed Claimant Ritalin for "breakthrough fatigue."  (R. 425.)  Dr. Ripley also informed Claimant that she needed to conserve her energy throughout the day and that her fatigue may be a long-term problem.  (*Id.*)

On October 12, 2012, Claimant underwent a physical therapy examination at the RIC. (R. 410.) This evaluation, performed by Physical Therapist ("PT") Anne Hooker, stated Claimant was not a good candidate for skilled physical therapy because she could complete all functional tasks independently. (R. 411.)

On July 29, 2013, Dr. Zachery McCormick of the RIC evaluated Claimant's physical therapy progress regarding her neck, shoulder, and foot pain as well as her general fatigue. (R. 514.) Dr. McCormick's review of Claimant's medical records indicated that as of December 12, 2012, Claimant was frustrated with the results of her neurophysical testing and no longer believed she could return to any type of work at Deloitte Consulting, her former employer. (R. 535.) Dr. McCormick's also noted that as of November 15, 2012, Claimant demonstrated mild residual cognitive impairment likely caused by Lyme Disease. (R. 536.) The records stated that Claimant meets the diagnostic criteria for Adjustment Disorder with Mixed Anxiety and Depressed Mood. (*Id.*) Based on his assessment and review of Claimant's records, Dr. McCormick recommended that Claimant complete a work trial to determine what environmental modifications, such as a quiet solitary work place, would be necessary in order for Claimant to be able to function at work. (*Id.*) Claimant declined to participate. (*Id.*) It was also noted at this appointment that Claimant had an upcoming five-week trip to her home in Mexico planned. (*Id.*)

On August 14, 2013, Claimant participated in occupational therapy where she continued to work on body mechanics, pacing, pain management, posture, and sensory deficit management. (R. 540-43.) During this appointment, the PT advised Claimant to

attend occupational therapy one to two times per week for three to four weeks.  (R. 543.)

On August 15, 2013, RIC PT Hannah Nilles reevaluated Claimant to assess Claimant's neck, shoulder, and foot pain as well as her general fatigue.  (R. 515.) Claimant described pain intensity as a seven on a scale of zero to eight.  (*Id.*)  Claimant stated that her pain affected her ability to complete daily living activities, and also affected her concentration, emotions, mobility, motivation, sleep, and work.  (*Id.*) Claimant also stated that pain increased while sitting, standing, and walking.  (*Id.*)  The PT report stated that Claimant's posture issues likely contributed to her pain and she would benefit from continued physical therapy.  (R. 518.)  The PT recommended physical therapy one to two times per week for three to four weeks.  (R. 519.)

On August 21, 2013, the RIC reevaluated Claimant's physical therapy progress. (R. 545.)  Claimant reported completing all assigned at home exercises, but did not notice any significant change in overall pain.  (*Id.*)

At Claimant's September 4, 2013 physical therapy appointment, Claimant reported having difficulty pacing herself during the previous weekend and experienced increased pain as a result.  (R. 550.)  During another physical therapy appointment, a PT instructed Claimant on use of activity analysis to handle household tasks or other plans or hobbies over a twenty-four hour period instead of attempting to complete all tasks in the morning in order to reduce fatigue.  (R. 554.)

Also on September 4, 2013, the RIC discharged Claimant from physical therapy and occupational therapy.  (R. 549.)  Claimant's final physical therapy assessment described Claimant as being a "good participant in physical therapy" and having "good

insight to activity tolerances and good application/integration of pain management strategies." (R. 558.) Claimant's final occupational therapy assessment stated Claimant "made good progress." (R. 562.) The assessment also stated that Claimant improved her posture and developed a daily pacing routine that has allowed for "decreased fatigue later in the day." (R. 562-63.)

After completing RIC's therapy programs, Claimant participated in follow up appointments on November 6, 2013 and April 14, 2014. (R. 587, 606.) During Claimant's first follow up in 2013, she reported running about four miles per day approximately five days per week. (R. 587.) Claimant also conveyed that she enjoyed the therapy programs at the RIC and learned how to better cope with her pain as a result. (*Id.*) In addition, Claimant reported being able to better pace her day, using deep breathing techniques to help with pain and fatigue. (*Id.*) During Claimant's second follow up appointment in 2014, Claimant stated that her pain was unchanged. (R. 609.) At this time, Dr. Randy Calisoff recommended Claimant continue with yoga, daily stretching, deep breathing, pacing, mindfulness, and her home exercise plan. (R. 610.)

### 4. Social Security Administration Evaluations

On November 2, 2012, Dr. Reynaldo Gontanco reviewed Claimant's disability insurance benefits application. (R. 71.) Dr. Gontanco stated,

> Medical evidence indicates that she had been having 'breakthrough fatigue,' which is now being treated with Ritalin. The evidence shows the claimant does not have extreem [sic] limitations in functioning. Therefore, the allegations exceed that supported by the overall weight of the medical evidence as a whole.
> (R. 625.)

Dr. Gontanco also stated that "[Claimant] has some limitations in the performance of certain work activities; however, these limitations would not prevent the [Claimant] from performing past relevant work." (R. 627.)

Upon Claimant's appeal, the Social Security Administration employed licensed clinical psychologist Dr. Mark B. Langgut to evaluate Claimant's psychological condition on April 18, 2013. (R. 464.) Dr. Langgut met with Claimant for forty-five minutes and conducted the following during that appointment: clinical interview, psychological consultation, review of accompanying records, mental status examination, collateral interview with Claimant's husband, and behavioral observations. (*Id.*) Dr. Langgut diagnosed her with Major Depressive Disorder, moderate, single episode. (R. 467.)

After Dr. Langgut's findings were reported to the Administration, Dr. Richard Smith reevaluated Claimant's disability insurance benefits application on May 16, 2013. (R. 81.) After review, Dr. Smith agreed with Dr. Gontanco's findings and concluded that Claimant was not disabled. (*Id.*)

### C. Claimant's Testimony

Claimant testified before the ALJ on August 21, 2014. (R. 40-68.) At the time of the hearing, she was fifty-two years old and living in an apartment with her husband. (R. 320, 40.) Claimant testified that she had previously obtained a Bachelor of Arts degree and a Master's degree. (R. 42.) Claimant discussed her previous work experience. (R. 42-44.) Most recently, she worked for Deloitte Consulting. (R. 41.) Previously, she owned a consulting firm called Group Harmony. (R. 43.) Before that, Claimant worked as the Director of Organizational Development with Continental

Casualty. (*Id.*) At the time of the hearing, Deloitte Consulting had already terminated Claimant as her medical leave could not be extended. (R. 42.)

Claimant explained that she could not return to work because of the symptoms she experiences as a result of contracting Lyme Disease in June 2011. (R. 43.) Claimant testified that she wakes up fatigued and it continues throughout the day. (R. 44.) In order to combat fatigue, Claimant stated that she takes daily naps. (R. 46.) Claimant testified that even if she does not sleep during her naps, she still goes to bed every day. (R. 47.) Claimant stated she is also using Ritalin to help with fatigue. (R. 48.) Claimant testified that although the medication does help, she still cannot go a day without napping because her "baseline frankly is so low." (*Id.*) Claimant testified if she did not take her medication she would sleep for an entire day. (*Id.*)

Claimant also testified she cannot return to work because she experiences daily pain as a result of poor posture as well as nerve damage caused by the Lyme Disease. (R. 44, 50.) Claimant described the pain of a burning and pressure sensation in her feet as well as kinks in her neck and a burning feeling in her shoulder. (R. 51.) Claimant stated she attempts to relieve her pain through a number of relaxation techniques including yoga and progressive muscle relaxation. (R. 52-53.) Claimant testified that the pain management program at RIC taught her how to manage her pain and has improved her quality of life. (R. 67.)

Claimant stated that fatigue and pain required her to reduce her professional and social activities. (R. 42.) Claimant continues to drive once a week to go to the gym. (R. 41.) Claimant also continues to walk/run four to five miles five days a week. (R. 44.) Claimant testified that physical exercise like running gives her "a little more energy" and

that on days when she does not run she experiences more pain and fatigue. (R. 44-45.) Claimant further testified that she used to train and compete in marathons. (*Id.*)

Claimant stated she declined to participate in a work trial in December 2012 because a one hour therapy appointment "exhausted her for the day." (R. 49.) Claimant testified she would be unable to serve in a less stressful, skilled job that required low focus and concentration, like an usher in a movie or a movie ticket taker, because she would be unable to stand for even two hours. (R. 49-50.) Moreover, Claimant testified that her fatigue would require her to take unscheduled breaks which would not likely be permitted by any employer. (R. 66.) Claimant also testified that returning to work would be impossible because the Lyme Disease has caused her cognitive functions to slow, making it difficult for her to maintain focus. (R. 51, 66.)

Claimant testified that she relies more on friends and family, especially her husband, since becoming ill. (R. 64.) Claimant described her daily routine as sleeping nine to ten hours a day, taking her medication, relaxing until her medication becomes effective, eating breakfast, running, resting, completing any necessary cognitive tasks, eating lunch, working on a household task, napping, working on a hobby, making dinner, eating dinner, and then going to bed. (R. 55.) Claimant stated her daily routine does not change when she travels. (R. 58.) Claimant and her husband own a home in Cozumel, Mexico, which they visit often. (R. 57.) Claimant added that changes to her daily routine cause increased fatigue. (R. 62.) Claimant's hobbies include learning to speak Spanish and reading for a few minutes every day. (R. 57-58.)

### D. Vocational Expert's Testimony

Vocational Expert Susan Entenberg (the "VE") also testified at the August 21, 2014 hearing in accordance with the Dictionary of Occupational Titles ("DOT") and the

Selected Characteristics of Occupations ("SCO").  (R. 68-69.)  The ALJ asked the VE to describe Claimant's past work.  (R. 68.)  The VE testified that all of Claimant's previous work has been sedentary and highly skilled, Skill Level and Specific Vocational Preparation ("SVP") of eight.  (*Id.*)

The ALJ asked the VE to assume the following hypothetical person: an individual with Claimant's age, work experience and education with the following exertional limitations: could sit six to eight hours out of the day, stand and walk at least six hours out of the day, could frequently lift and carry ten pounds, and occasionally twenty pounds.  (R. 68-69.)  Then the ALJ asked whether such an individual could still perform all of Claimant's past relevant work.  (R. 69.)  The VE testified that such an individual could complete all of Claimant's prior work.  (*Id.*)

The ALJ next asked the VE if the previously described hypothetical person needed to lie down approximately two hours a day would Claimant's past work be available to them.  (*Id.*)  The VE responded that Claimant's previous work would not be available on a full-time basis to someone who needed to lie down several hours out of a day.  (*Id.*)  The ALJ then asked if any full-time work would be available to such a person.  (*Id.*)  The VE testified that no full-time work would be available.  (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971)). This court must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence… [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis under the Social Security Act

In order to qualify for disability insurance benefits or supplemental security income, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant

has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. If claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. At step one, the ALJ found that Claimant was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity during the period from her alleged onset date of June 30, 2011, through her date last insured of December 31, 2016. (R. 19.) At step two, the ALJ found that Claimant had the following severe impairments: Lyme's Disease, with a history of Bell's Palsy; and a history of atrial flutter. (R. 21.) The ALJ also noted Claimant's non-severe impairments of asthma/allergies, bilateral foot pain, reported neck and shoulder pain as well as medically determinable mental impairments of depression, anxiety, and cognitive disorder. (*Id.*) At step three, the ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21.) At step four, the ALJ found that Claimant has no limitation in activities of daily living, mild limitations in social functioning, no limitation in concentration, persistence or pace, and no episodes of decompensation. (R. 22.) The ALJ determined that Claimant has the Residual Functional Capacity ("RFC") to perform

sedentary work as defined in 20 C.F.R. 404.1520(d), 404.1525, and 404.1526.  (*Id.*)

RFC is a claimant's ability to do physical and mental work activities on a sustained basis

despite limitations from his/her impairments.  In making this finding, the ALJ must

consider all of the claimant's impairments, including impairments that are not severe.

20 C.F.R. 404.1520(e) and 404.1545; SSR 96-8p.  The ALJ found that considering

Claimant's age, education, work experience, and RFC, Claimant's impairment could

reasonably be expected to cause some of her alleged symptoms; however Claimant's

statements concerning the intensity, persistence, and limiting effects were not found to

be entirely credible.  (R. 29.)

The ALJ decided that Claimant "is able to do at least sedentary work, which

would include all of her previous relevant work."  (*Id.*)  The ALJ concluded that "this

work does not require the performance of work-related activities precluded by the

claimant's RFC (20 C.F.R. 404.1565)."  (R. 30.)  As a result, the ALJ determined that

Claimant has not been under a disability from June 30, 2011 though the date of her

decision (20 C.F.R. 404.1520(f)).  (*Id.*)  As the ALJ found Claimant to be able to

complete her relevant past work, the ALJ did not conduct a step five analysis.

Claimant now argues that the ALJ did not support her decision with substantial

evidence.  Specifically, Claimant contends that: (1) the ALJ failed to comply with Social

Security Ruling ("SSR") 96-8p by improperly finding Claimant had the RFC to perform

the full range of sedentary work; (2) the ALJ failed to properly assess Claimant's

subjective symptoms as "credible" under SSR 16-3p; and (3) the ALJ neglected to

adequately develop the record regarding the mental and physical demands of

Claimant's past relevant work as required under SSR 82-62. We address each of Claimant's arguments below.

### C. The ALJ Provided an Adequate Explanation for Her Decision to Find Claimant Capable of Performing Sedentary Work.

Claimant challenges the ALJ's finding that she has the RFC to perform the full range of sedentary work, which involves sitting, occasional walking and standing, and lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). First, Claimant claims that the ALJ's RFC determination is flawed because the ALJ failed to consider the difference between engaging in occasional physical activity and having the capacity to work full-time or approximately eight hours a day for five days a week as required by SSR 96–8p. SSR. 96–8p, 1996 SSR LEXIS 5. Second, Claimant argues that the ALJ erred in relying on the opinions of two state agency medical consultants because those doctors did not review Claimant's medical reports from April 2013 through November 2014. We disagree.

Pursuant to SSR 96-8p, "the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR. 96–8p, 1996 SSR LEXIS 5; *see Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Claimant contends that the ALJ's narrative discussion only described Claimant's "extensive amount" of daily activities and negated Claimant's treating physicians' notes that describe her chronic pain, fatigue, and cognitive difficultly. (R. 61-63, 73-81, 606-10, 622-28.) Contrary to Claimant's contentions, we find that the ALJ provided a sufficient discussion to support her decision

using substantial evidence. The ALJ reviewed the medical evidence, discussed Claimant's treating physicians' notes as well as the opinions of state agency medical consultants, and Claimant's testimony. (R. 24-28.)

In particular, the ALJ reviewed the medical evidence relating to Claimant's physical and mental impairments from July 2011 through November 2014 and discussed several of Claimant's treating physicians' notes. (*Id.*) After this review, the ALJ concluded that none of Claimant's treating physicians suggested that Claimant's Lyme Disease caused her cognitive issues, pain, or fatigue. (R. 29.) The ALJ cited to Dr. Hardesty's conclusion that Claimant's cognitive difficulties likely steamed from fatigue and perhaps depression and that her Lyme Disease only indirectly contributed to these issues. (R. 24.) The ALJ also pointed to a 2012 treatment note from Claimant's psychiatrist and neurologist that categorized Claimant as having at least a high-average intellectual capacity. (*Id.*) Likewise, the ALJ's opinion incorporated psychologist Dr. Lanngut's opinion that Claimant demonstrated "significant concentration and very good effort, with intact immediate, short-term and long-term memory." (R. 27.) The ALJ also cited to an RIC progress note from 2013 that reported that Claimant's physical and neurological exam were generally "unremarkable." (*Id.*)

After conducting her review of the medical evidence in its entirety, the ALJ found the opinions of state agency medical consultants, Dr. Smith and Dr. Gontanco, were supported by objective evidence. (R. 27, 29.) Both doctors opined that Claimant could perform light work, without any postural, manipulative, visual, communicative, or environmental limitations. (R. 27.) These opinions were based in part on the fact that

Claimant's daily activities had not been limited by her fatigue as well as the fact that Claimant's physical exams "noted overall normal findings with no limitations." (*Id.*)

In addition, the ALJ considered Claimant's testimony regarding her ailments, medications, and daily activities. (R. 28.) Based on this thorough review, the ALJ provided an adequate analysis in support of her finding regarding Claimant's RFC determination. See *Knox v. Astrue*, 327 Fed.Appx. 652, 657 (7th Cir. 2009) ("The ALJ satisfied the discussion requirements by analyzing the objective medical evidence, [claimant]'s testimony (and credibility), and other evidence.").

Moreover, we are not persuaded by Claimant's argument that the ALJ erred in relying on the opinions of two state agency medical consultants because those doctors did not review Claimant's medical reports from April 2013 through November 2014. In *Keys v. Berryhill*, the court held that the claimant failed to provide any evidence that unexamined test results and medical reports would have changed the reviewing doctors' opinions regarding the claimant's RFC. *Keys v. Berryhill*, 2017 WL 548989, at *3, 4 (7th Cir. Feb. 9, 2017). This case is no different. Claimant did not provide any evidence that her treatment records from the RIC would have caused the state agency medical consultants to change their determination that Claimant could perform light work. In addition, the ALJ took these reports into consideration when she decided to limit Claimant's RFC to sedentary. (R. 29.)

Moreover, the ALJ did not error by accepting medical opinions that were not contradicted. See *Filus v. Astrue*, 694 F.3d 863, 867 (7th Cir. 2012); see also *Rice v. Barnhart*, 348 F.3d 363, 370 (7th Cir. 2004) (stating the ALJ should rely on medical opinions in assessing a claimant's RFC). As none of Claimant's treating physicians

limited Claimant's activities, including her employment, it was reasonable for the ALJ to rely on the state agency medical consultants' opinions.  In addition, one of Claimant's treating PT's suggested that she participate in a work trial in December of 2012.  (R. 26.)  Although Claimant chose not to participate, the fact that it was recommended indicates that Claimant's PT believed she was capable of returning to work.

For these reasons, we find that the ALJ provided an adequate analysis in support of her RFC determination.  As a result, Claimant's request that we remand on these grounds is denied.

### D. Claimant's Daily Activities and Her Credibility.

Next, Claimant contends that the ALJ erred in finding her statements concerning the intensity, persistence, and limiting effects of her subjective symptoms, namely pain and fatigue, lacked "credibility."[1]  An ALJ will engage in a credibility analysis when, as here, the alleged symptoms lack objective medical evidence.  See *Golembiewski v. Barnhart*, 322 F.3d 912, 915–16 (7th Cir. 2003).  In order to conduct a credibility determination in accordance with SSR 16-3p, the ALJ must follow a two step process

---

[1] The Administration recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character."  *Id.* at *1. Though SSR 16-3p post-dates the ALJ hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). See also *Cole v. Colvin*, 831 F.3d 411, 415 (7th Cir. 2016). A comparison of the previous and current guidance reveals substantial consistency.  Both rulings outline a two-step process to be followed and the factors to be considered when determining the intensity and persistence of a party's symptoms. Compare SSR 16-3p and SSR 96-7p. Stated differently, "[t]he agency has had only one position, although it has expressed that position in different words." *Homemakers N. Shore v. Bowen*, 832 F.2d 408, 413 (7th Cir. 1987). Therefore, it is appropriate to evaluate Claimant's credibility argument in light of the new guidance the Administration has provided.

for evaluating symptoms. First, the ALJ must determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. Second, the ALJ must evaluate an individual's symptoms based on the evidence in an individual's record including objective medical evidence, statements from the individual, medical sources, and non-medical sources like agency personnel. SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). In addition, ALJs must consider the applicable factors set forth in 20 C.F.R. 404.1529(c)(3) and 416.929(c)(3). These factors include:

> Daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

> SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016).

In this case, the ALJ stated Claimant could run four to five miles, five days a week, go to the gym for strength training and stretching, travel to her second home in Mexico, cook, shop, clean, learn Spanish on Skype with a tutor, pay bills, manage three households, send emails, and use Facebook. (R. 29.) Claimant argues that the ALJ failed to acknowledge that she performs these activities by pacing herself and is nearly always in pain or fatigued. (R. 40, 44-45, 50.) Moreover, Claimant contends that the ALJ failed to conduct a proper analysis by failing to explain how the standard applied to the facts and circumstances of the case.

To successfully challenge the ALJ's finding regarding Claimant's subjective complaints, she must overcome the highly deferential standard this Court applies to the ALJ's determination. Because the ALJ is in a superior position to assess the testimony of a witness, this Court will only reverse if it is "patently wrong." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2010); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The patently wrong standard continues to be applied since the enactment of SSR 16-3p. See, e.g., *Smith v. Colvin*, 2017 WL 635143, at *7–8 (N.D. Ill. Feb. 16, 2017); *Quinones v. Colvin*, 2017 WL 337993, at *2–3 (N.D. Ill. Jan. 23, 2017); *Simon-Leveque v. Colvin*, 2017 WL 168182, at *8 (N.D. Ill. Jan. 17, 2017); *Teschner v. Colvin*, 2016 WL 7104280, at *6 (N.D. Ill. Dec. 6, 2016); *Williams v. Colvin*, 2016 WL 6778219, at *3 (N.D. Ill. Nov. 14, 2016); *Murphy v. Colvin*, 2016 WL 5807993, at *7 (N.D. Ill. Oct. 5, 2016). Nevertheless, the ALJ is still required to "build an accurate and logical bridge between the evidence and the result [.]" *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (internal quotation marks and citation omitted). "In analyzing an ALJ's opinion for such fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it." *Id.*

Here, the ALJ found that Claimant's statements were "not entirely credible" because Claimant's statements were somewhat inconsistent, and at times contradicted statements made in the medical evidence of the record. (R. 29.) The ALJ stated that Claimant's statements that she needed to take daily naps to fight fatigue is contradicted by a 2012 treatment note that stated that Claimant is no longer napping. (R. 421, 475.) When asked about this note during the hearing, Claimant testified that she may not have been napping at the time, but still took two hour breaks to rest in bed. (R. 44.) In

addition, the ALJ noted that Claimant gave inconsistent reports to her physicians and PTs about being able to manage her household finances independently.  (R. 26.)

The ALJ then explained that Claimant continues to "do an extensive amount [of] activities, including running, walking, and going to the gym during the alleged period of disability."  (R. 29.)  This court and others have repeatedly found that participation in limited daily activities is not enough to prove that a claimant is not in pain.  See *Clifford*, 227 F.3d at 872 (citing *Thomas v. Sullivan*, 987 F.2d 1482,1490 (10th Cir. 1993) ("an ALJ may not rely on minimal daily activities as substantial evidence that claimant does not suffer disabling pain.")).  As the Seventh Circuit has explained:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons, and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent and deplorable feature of opinions by administrative law judges in social security disability cases.

*Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

Similarly, the Seventh Circuit has stated that claimants do not need to be unable to function in any capacity in order to be disabled.  See *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 351–52 (7th Cir. 2010); *Gentle v. Barnhart*, 430 F.3d 865, 867–68 (7th Cir. 2005).

Nevertheless, the Seventh Circuit has differentiated daily activities and functioning in some capacity from extended physical exertion.  See *Simila v. Astrue*, 573 F.3d 503, 518 (7th Cir. 2009) ("the ALJ has a host of facts upon which to base her opinion… Chief among them was evidence of [claimant's] activities.").  In *Simila*, the claimant helped build a log home, replaced a gas tank, attended his son's traveling hockey games, and went hunting and fishing.  *Id.*  The court identified these activities as

"not light tasks" and distinguished them from fairly restricted daily activities like washing dishes, helping one's children prepare for school, doing laundry, or preparing dinner, which do not necessarily undermine or contradict a claim of disabling pain. See, e.g., *Zurawski*, 245 F.3d at 887. We find that Claimant's case is comparable to *Simila*. Here, Claimant's consistent four to five mile runs five days a week are analogous to hunting and fishing, and Claimant's host of other activities are not "fairly restricted." Therefore, we find that these activities undermine her claim of fatigue and pain.

Moreover, the ALJ did not completely discount Claimant's testimony regarding her limitations. (R. 29.) The ALJ's decision to limit Claimant's range of work to sedentary when assessing her RFC is evidence that the ALJ considered Claimant's testimony regarding her subjective symptoms that were unsupported by the objective medical record. See *Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007) ("[T]he ALJ did not totally discount [claimant's] testimony regarding how her pain affected her ability to perform certain activities, as evidenced by the ALJ's decision to limit [claimant's] range of work to sedentary when assessing her residual functional capacity").

Next, Claimant's claim that the ALJ's failure to address Claimant's lengthy work history requires remand is incorrect. An ALJ may consider a claimant's long and continuous employment record to be evidence that the claimant is in fact unable to continue to work. See *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir.1983)); see *Reed v. Colvin*, 656 Fed.Appx. 781 (7th Cir. 2016) (explaining that claimant's long and consistent work history does not negate the inconsistencies in the record and therefore a finding of not credible). But, work history is just one of the factors the ALJ can use to analyze credibility, and it is not

dispositive. *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) ("the ALJ's silence [regarding claimant's work history] is not enough to negate the substantial evidence supporting the adverse credibility finding"). See also *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998). Therefore, the ALJ's failure to note Claimant's work history is not enough to undermine the other substantial evidence supporting her decision.

In sum, Claimant's extended physical daily activities – even if accompanied by pain and fatigue – can fairly be construed as inconsistent with her claim that she is physically unable to perform even sedentary work. Accordingly, we find that the ALJ provided sufficient reasons for her determination that Claimant's allegations regarding her limitations were not fully credible, and we will not disturb those findings.

### E. The ALJ Did Consider the Demands of Plaintiff's Past Relevant Work.

Finally, Claimant argues that the ALJ failed to develop the record regarding claimant's ability to perform her past relevant work. After establishing a claimant's RFC, the ALJ must determine whether an individual is able to do any past relevant work. At Step four, the ALJ must compare the individual's RFC with the requirements of his or her past relevant work. If the individual's RFC is consistent with the demands of any of her past relevant work, we will find the individual not disabled.

In this case, the ALJ determined Claimant's RFC to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a). (R. 23.) The RFC included no mental or physical limitations other than Claimant's need to primarily be stationary due to her fatigue and low endurance. (R. 24-29.) Claimant's RFC coupled with the VE's testimony that all of Claimant's previous relevant work experienced had been sedentary

and highly skilled, SVP of eight, lead the ALJ to conclude that Claimant is able to perform all of her past work as it is actually and generally performed. (R. 68, 30.)

Claimant now contends that this court must remand because the ALJ did not address the actual duties of Claimant's previous relevant work as required by SSR 82-62. SSR 82-62 provides that "past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." In support of this argument, Claimant cites to *Smith v. Barnhart*, 388 F.3d 251, 252 (7th Cir. 2004). In *Smith*, the Seventh Circuit held that an ALJ cannot simply state that a claimant can complete sedentary work in general in making a determination that he or she can continue performing past relevant work. The Court explained that "[the ALJ] should have considered whether [the claimant] could perform the duties of the specific jobs that she had held." *Smith*, 288 F.3d at 252. See also *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir. 1984); *Lowe v. Apfel*, 226 F.3d 969, 972–73 (8th Cir. 2000); *Kirby v. Sullivan*, 923 F.2d 1323, 1326–27 (8th Cir.1991). We find that *Smith* is distinguishable from this case. Here, the ALJ did not merely state Claimant could perform sedentary work in general; rather, the ALJ compared Claimant's RFC with her prior positions as an Insurance Organizational Development Management, an Accounting Manager, and Management Consultant. (R. 30.) She noted that she was considering and comparing "the physical and mental demands of *this* work." (*Id.*) (emphasis added). Therefore, we conclude that the ALJ properly held that Claimant could perform her past relevant work. *Cohen v. Astrue,* 258 Fed.Appx. 20, 28 (7th Cir. 2007) (holding that the ALJ's step 4 analysis was adequate where the ALJ considered claimant's specific job when

finding that claimant could perform past sedentary work).  For this reason, Claimant's request for a remand on these grounds is denied as well.

## III. CONCLUSION

For the reasons set forth above, Claimant's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted. It is so ordered.

DATED: September 7, 2017

_____
Michael T. Mason

United States Magistrate Judge